UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HELENA MUNSON,

               Plaintiff,

v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

Case No. 11-12475

District Judge John Corbett O'Meara
Magistrate Judge R. Steven Whalen

_____/

## REPORT AND RECOMMENDATION

Plaintiff Helena Munson brings this action under 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits and Supplemental Security Income Benefits under the Social Security Act. Parties have filed cross motions for Summary Judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment [Doc. #21] be DENIED and that Plaintiff's Motion for Summary Judgment [Doc. #18] be GRANTED, to the extent that the case be remanded for further proceedings.

## I.  PROCEDURAL HISTORY

Plaintiff applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") on December 20, 2006, alleging a disability onset date of January 31, 2004 in both applications (Tr. 187, 191).  Upon denial of the claim, Plaintiff requested an administrative hearing, held on July 14, 2009 in Evanston, Illinois (Tr. 16).  In order to accommodate the Vocational Expert ("VE"), a supplemental hearing was held on August 12, 2009 in Evanston, Illinois (Tr. 43).  Administrative Law Judge ("ALJ") Daniel Dadabo presided at both hearings (Tr. 16, 43).  Plaintiff, represented by attorney Philip Fabrizio, testified by video conference from Oak Park, Michigan at both hearings (Tr. 22-41, 51-59). VE James K. Radke testified at the August 2009 hearing by telephone (Tr. 46-59).  On August 27, 2009, ALJ Dadabo issued a decision finding that Plaintiff was not under a "disability," as defined in the Social Security Act, because she could perform jobs that exist in the national economy (Tr. 72-80).  On May 14, 2010, the Appeals Council denied Plaintiff's request for review (Tr. 4-7).  Plaintiff filed suit in this court on June 8, 2011.

## II.  BACKGROUND FACTS

Plaintiff, born November 19, 1961, was 42 years old at the time of the administrative decision (Tr. 79, 187).  She graduated from high school (with special education classes) and earned a Certified Nurse's Assistant ("CNA") license by passing a vocational examination in 1980 (Tr. 23, 247-48).  Plaintiff's longest held job was working as a CNA (approximately eight years); additionally, she has worked in shipping and receiving, industrial packing, and as a hotel housekeeper (Tr. 243).  Plaintiff is unmarried with three children, ages 13, 18, and

27 (Tr. 426). She alleges disability as a result of chronic asthma, back problems (spasms), learning disability, and dyslexia (Tr. 242).

### A. Plaintiff's Testimony

At the July 2009 hearing, Plaintiff testified that she lived with her seventeen year-old son and her eight year-old granddaughter (Tr. 33). She stated that she stood approximately five feet six and a half inches tall and weighed 180 pounds (Tr. 24). She indicated that muscle spasms in her back have prevented her from driving for the past two years (Tr. 23). Plaintiff testified that she received food stamp assistance and held a Medicaid card (Tr. 36).

Plaintiff reported that she was allowed to take the CNA license exam with special accommodations as a result of her learning disability (Tr. 26). As a result of her reading limitations, she asserted that she required assistance from a co-worker in order to perform daily charting as a CNA (Tr. 27). She also stated that she was enrolled in special education classes throughout high school (Tr. 23).

Plaintiff reported that she stopped working because past employers repeatedly told her that she "can't do the work" (Tr. 35). She indicated that her asthma is probably her most debilitating health issue, but she also noted that her back pain and learning disability further contribute to her disability (Tr. 32-36). She stated that she was hospitalized for three to four days in 2008 for asthma induced conditions (Tr. 30).

Plaintiff reported that she could sit for 20-30 minutes at a time, stand for 30 minutes at a time, and walk up to a block at a time (Tr. 24). She stated that she could lift 10-20 pounds (Tr. 24). She indicated that she took Albuterol through a breathing machine three to four

times daily for her asthma (Tr. 29-30). She reported that she also took Darvocet, muscle relaxants, Motrin and medication for diabetes (Tr. 31-38). Plaintiff testified that she had a full hysterectomy and bladder suspension surgery in August 2009 (Tr. 51).

Plaintiff stated that her seventeen year-old son and twenty-seven year-old daughter performed the majority of her household chores, but she also indicated that she makes small contributions to daily household tasks (Tr. 34-36). However, she reported that due to the cumulative effect of her health conditions, she is largely dependent on her two children (Tr. 35).

In response to questioning by her attorney, Plaintiff stated that she lost her most recent job as a result of her difficulty in following simple instructions and due to her slow pace (Tr. 40).

### B.  Medical Records

### 1.  Treating Sources

In January 2004, Plaintiff visited her longtime treating physician Dr. Clearance McRipley, Jr., M.D. for "unspecified chest pains" (Tr. 393). During a treadmill stress-test, Plaintiff tested negative for "EKG changes to suggest Ischemia" (Tr. 403). The stress-test also found the absence of "exercise-induced chest pain" (Tr. 403).

In April 2004, Dr. Vishnubhai U. Patel, M.D., surgically removed gallstones from Plaintiff's gallbladder with no complications (Tr. 390).

In October 2005, Dr. McRipley completed a medical needs form for the Michigan Department of Human Services, diagnosing Plaintiff with "Acute Asthma, Severe-Chronic

-4-

Lumbar Strain, GERD, and Anemia" (Tr. 487).  He opined that she could "never" work (Tr. 487).  Dr. McRipley failed to support his diagnosis with any objective medical findings.  However, Dr. McRipley's handwritten records, which are difficult to read, appear to document the development of the above-listed conditions throughout 2005 (Tr. 488-90).

In April 2006, Dr. McRipley completed an additional medical needs form, diagnosing Plaintiff with "Chronic Cholitithiasis" (gallbladder condition), Acute Asthma, and Chronic Lumbar Strain (Tr. 493).  Again, he indicated that she could "never" work, without providing further explanation of Plaintiff's health (Tr. 493).

In June 2006, Dr. McRipley completed an additional medical needs form, diagnosing Plaintiff with "Chronic Cholitithiasis, Acute Asthma, Chronic Lumbar Strain, and Dermatitis Papilosis/Nigrens Generalized" (Tr. 492).  Dr. McRipley opined that Plaintiff could "never" work (Tr. 492).

Finally, in September 2006, Dr. McRipley completed yet another medical needs form, diagnosing Plaintiff with "Chronic Cholitithiasis, Acute Asthma, and Chronic Lumbar Strain," and once again concluded that Plaintiff could "never" work (Tr. 491).  Dr. McRipley's almost illegible examination notes from 2006 state that Plaintiff experienced muscle spasms in her back, had difficulty breathing at times, and endured abdominal pains as a result of "Chronic Cholitithiasis" (Tr. 475-78).  However, Dr. McRipley's records fail to offer diagnostic evidence in support of the above-mentioned conditions.

On September 30, 2006, Plaintiff was admitted to the North Oakland Emergency Center in Pontiac, Michigan because she experienced difficulty breathing due to asthma (Tr. 342-

48). The attending Physician noted that her throat was significantly swollen (Tr. 343). X-Rays showed that the soft tissues of the neck were "normal" (Tr. 348). The record fails to indicate when she was discharged.

In December 2006, Dr. McRipley completed a medical needs form for the Michigan Department of Human Services, concluding that Plaintiff was "permanently disabled" (Tr. 486). He diagnosed Plaintiff with "Hypertension, GERD, Severe Asthma, and Severe Lumbar Strain," without offering further explanation or documentation of her disability (Tr. 486). Dr. McRipley's fall 2006 examination notes report that Plaintiff experienced back issues, breathing difficulties, and severe headaches (Tr. 479-81).

On April 6, 2007, Dr. McRipley completed an additional medical needs form, again concluding that Plaintiff was "permanently disabled" (Tr. 484). His diagnosis was identical to the December 2006 medical needs form. Dr. McRipley found that while Plaintiff was "sometimes" able to sit and grasp, she was precluded from standing, walking, squatting, climbing, and lifting more than 10 pounds (Tr. 471). Dr. McRipley's notes from March 2007 state that plaintiff experienced back pain and had some respiratory issues (Tr. 477).

On April 10, 2007, Plaintiff was admitted to North Oakland Medical Center in Pontiac, Michigan for shortness of breath and a headache (Tr. 515). The attending physician reported that she was in "mild respiratory distress" and exhibited a "positive wheeze scattered bilaterally," diagnosing her with Acute Exacerbation of Asthma (Tr. 515). The following day, the attending physician noted that her condition was normal and she was discharged (Tr. 518-20).

In March 2009, Dr. McRipley completed a Physical Capacities Assessment form, diagnosing Plaintiff with lower back strain, asthma, and tension headaches (Tr. 450-52). He found that she was "sometimes" able to sit, stand, and walk, but was precluded from lifting more than 10 pounds, squatting, pushing, and climbing (Tr. 450). Dr. McRipley reported that she exhibited wheezing and suffered from spasms of the lower back (Tr. 451-52). The next month, he completed an additional Physical Capacities Assessment form, making identical conclusions (Tr. 457-59).

In August 2009, Plaintiff underwent surgery for stress incontinence without any complications (Tr. 444-49).

### 2. Non-Treating Sources

At the request of the SSA, Plaintiff was examined in April 2005 by Dr. Daniel Ross, D.O., for disability due to chronic asthma and back spasms (Tr. 412-16). Dr. Ross noted a 13-year history of asthma and a 10-year history of smoking (Tr. 412). Plaintiff reported that she had not smoked for the past two years (Tr. 412). Dr. Ross noted that she used an inhaler, Singulair, and Flovent, and that she had never been hospitalized for asthma (Tr. 412). He also stated that she experienced shortness of breath when walking at fast pace (Tr. 412). Dr. Ross acknowledged that she exhibited expiratory wheezes during the exam (Tr. 416). In regard to Plaintiff's back spasms, Dr. Ross noted that she attributed the spasms to the physical labor she performed as a CNA, and reported that the pain had occurred for approximately six years (Tr. 412). Dr. Ross' report indicates that Plaintiff never had x-rays or imaging studies to evaluate her back, however, he noted that she took Darvocet for pain

associated with her back (Tr. 412). Additionally, Dr. Ross reported that she can sit, stand, and walk only for 20 minutes at a time, and that she cannot lift greater than 15 pounds (Tr. 412). He noted that she exhibited mild difficulty getting on and off the examination table and in performing heel to toe walking, but experienced severe difficulty squatting (Tr. 413). He stated that her hearing and speech were normal, and that she was cooperative throughout the exam (Tr. 413).

In May 2005, a non-examining Physical Residual Functional Capacity Assessment conducted on behalf of the SSA found that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; sit, stand, or walk for approximately six hours in an eight-hour work day; and push and pull without limitation (Tr. 418). The assessment found that she could climb, stoop, kneel, crouch, and crawl occasionally (Tr. 419). The assessor noted the absence of balance issues (Tr. 419). The assessment also found the absence of manipulative, visual, and communicative limitations, but determined that she should avoid even moderate exposure to fumes, odors, dust, and poor ventilation due to her asthma (Tr. 421). Plaintiff's allegations were deemed "partially credible" and only "somewhat consistent with the medical record" (Tr. 422).

The same month, Plaintiff underwent a consultative examination by psychologist Dr. Nicholas J. Bodoin, Ph.D. (Tr. 425-29). Plaintiff reported a combination of physical and mental ailments, however, she indicated that she had not worked since 2004 due to an "intensification of her physical symptoms" (Tr. 425-26). Plaintiff communicated to Dr. Bodoin that while she helps her youngest child prepare for school every morning, her oldest

child assists her in performing daily household chores (Tr. 426). Dr. Bodoin reported that

her grooming, attire, and hygiene were marginal and that she had difficulty maintaining eye

contact throughout the exam (Tr. 426). Dr. Bodoin observed low self-esteem, limited

capacity for insight, and poor communication skills, but no evidence of psychotic symptoms

(Tr. 427). She seemed markedly depressed but was oriented to time, person, and place (Tr.

427). Dr. Bodoin conducted the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III)

and the Wide Range Achievement Test-Revision Three (WRAT-3) (Tr. 428-28). Under the

WAIS-III, Plaintiff's overall level of intellectual functioning revealed extremely low

classification, with a Full-Scale IQ score of 57; Verbal IQ of 61; and Performance IQ of 59

(Tr. 428). She displayed moderate to severe impairment with regard to all assessed cognitive

skills but displayed strengths in expressive vocabulary and visual attentiveness (Tr. 428).

Under the WRAT-3, she could only decode a few simple one syllable words and was limited

to adding and subtracting one digit numbers with the use of her fingers (Tr. 429). Plaintiff

scored below the first percentile (Tr. 429). Dr. Bodoin recorded a current Global Assessment

of Functioning (GAF) score of 50, and 55 in the past year[1], and determined that she was not

able to manage her own benefits (Tr. 429). Dr. Bodoin's diagnostic assessment was

cognitive disorder and mood disorder (Tr. 429).

 In June 2005, consultative psychologist Rom Kriauciunas, Ph.D., performed a Mental

---

[1]GAF scores from 41-50 indicate serious symptoms or functional limitations;
scores from 51-60 indicate moderate symptoms or functional limitations; and scores from
61-70 indicate only mild symptoms. *The Diagnostic and Statistical Manual of Mental
Disorders*, 32-34 (4th Ed. 2000).

Residual Functional Capacity assessment on behalf of the SSA (Tr. 430-33). Dr. Kriauciunas found that Plaintiff was "not significantly limited" in her ability to remember, understand, and carry out very short and simple instructions; perform activities within a schedule; complete a normal workday and workweek without interruption; interact in a socially appropriate manner; to be aware of normal hazards and take precautions; to use public transportation; and to set realistic goals or make plans independently of others (Tr. 431-33). However, Dr. Kriauciunas acknowledged that Plaintiff was "moderately limited" in her ability to understand, remember, and carry out detailed instructions, and to respond appropriately to changes in the work setting (Tr. 431-33). He concluded that Plaintiff was able to perform unskilled work on a sustained basis (Tr. 433). The same day, Dr. Kriauciunas conducted a Psychiatric Review Technique affirming Dr. Bodoin's diagnosis of cognitive disorder and mood disorder (Tr. 436, 38). Under-cutting Plaintiff's credibility, he opined that Plaintiff's "vocational and interpersonal history suggests higher cognitive functioning than measured IQ scores" (Tr. 436).

In March 2007, because Plaintiff failed to return the required paperwork, a non-examining Psychiatric Review performed on behalf of the SSA was deemed "incomplete" due to "insufficient evidence" (Tr. 351- 72).

In July 2009, subsequent to the first Administrative hearing, Plaintiff was examined by Dr. Essam Montasir, M.D., a board certified physician in internal medicine (Tr. 533-44). Plaintiff was examined for alleged disability due to asthma, back issues, learning disability, and dyslexia (Tr. 533). Dr. Montasir reported that she was diagnosed with asthma in 1992,

-10-

and with a few exceptions, she reasonably controlled her condition with medication (Tr. 533).  Dr. Montasir's report indicates that her asthma flares up due to infections and as a result of exposure to certain smells and fumes (Tr. 535).  During the examination, Dr. Montasir observed scattered wheezing bilaterally and excessive wheezing on exhalation (Tr. 534).  While Plaintiff managed to get on and off the examination table without difficulties, she experienced shortness of breath (Tr. 534-35).  Dr. Montasir found that she had full use of her hands; could lift 20 pounds frequently and 10 pounds continuously; sit for 6 hours, stand for 2 hours and walk for 1 hour in an eighth hour workday; and occasionally climb ladders and scaffolds (Tr. 536-39).  However, Dr. Montasir precluded her from stooping, kneeling, crouching and crawling (Tr. 539).  The assessment also determined that she should not be exposed to harmful environmental conditions such as humidity, dust, and other pulmonary irritants (Tr. 540).  Dr. Montasir concluded that she was capable of performing daily tasks such as shopping, using public transportation, preparing meals, and practicing personal hygiene (Tr. 541).  Upon examination of Plaintiff's lumbar spine, Dr. Montasir recorded that her breadth of motion fell within a "normal" range (Tr. 542).

## C.  Vocational Testimony

At the August 2009 Administrative hearing, VE James K. Radke classified Plaintiff's past work as a CNA as exertionally medium and semi-skilled, and classified her work as a housekeeper as exertionally light and unskilled (Tr. 48).  The ALJ then posed the following question to the VE:

-11-

Now, the consultative examiner who evaluated her recently… indicated that she's basically limited to sedentary work…Seeing that he indicated she could not bend, kneel, crouch, or crawl. He's got environmental limitations as far as…excessive concentrations of dust, fumes, odors, and temperature extremes. I'm going to suggest that this lady cannot do more than occasional stairs, and probably needs a level work surface. She probably also has to have an accommodation for jobs that do not require more than short demonstration. We probably won't want any public contact, work, or any work that's going to require frequent communication. Now assuming that the consultative examiner adequately captured the claimant's functional or functioning, my sense is that she's not going back to any work she did before, correct?

The VE replied that Plaintiff was not capable of performing past relevant work (Tr. 48).

The VE testified, that based upon the above limitations, Plaintiff could perform the unskilled, sedentary jobs of office clerk and assembler/inspector (Tr. 49). The VE indicated that there are 1,800 office clerk positions and 250 assembler/inspector positions in the Detroit area (Tr. 49). The VE also testified that these positions existed in the "thousands" nationwide (Tr. 49). He indicated that the identified jobs were unskilled demonstration-learning positions that required little reading and no grade level competency (Tr. 50).

The ALJ then asked the VE whether the types of employers he identified would make special accommodations by allowing additional breaks for Plaintiff to rest and/or to use a breathing device for her asthma (Tr. 50). The VE responded that an individual would not be able to maintain employment if she needed to take additional unscheduled breaks (Tr. 51). Next, the ALJ asked the VE whether her cognitive deficits, as shown by Dr. Bodoin's testing, would limit her ability to perform the identified positions. The VE stated that even if Dr. Bodoin's assessment were accurate, she would still be able to perform the assembly/inspection position (Tr. 55). The VE testified that as an assembly/inspection

-12-

worker, she would encounter about the same level of environmental exposures relating to her asthma as she would encounter going outside (Tr. 56).  The VE also testified that it was unlikely that Plaintiff avoided charting as a CNA (Tr. 58).

### D.  The ALJ's Decision

ALJ Dadabo found that although Plaintiff experienced severe impairments of "borderline intellectual functioning; asthma, and lumbar degenerative arthritis," none of the conditions met or equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 75). He determined that her gynecological issues, finger injury, diabetes, gallstones, and anemia were "non-severe" impairments (Tr. 75).

The ALJ held that Plaintiff's mental impairments do not meet or equal the criteria of listings 12.04 and 12.05 and concluded that she was only moderately limited with respect to her mental capacity (Tr. 76).  The ALJ found that her medical history alone did not provide an adequate record for assessing her disability (Tr. 76).  He explained that her work background and overall degree of independence tends to mitigate against the presence of a significant mental disability (Tr. 76).

The ALJ found that Plaintiff retained the Residual Functional Capacity ("RFC") to

perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a)[2] with the following restrictions:

> [N]o bending, kneeling, crouching or crawling; no excessive concentrations of dust, fumes, odors, or temperature extremes; only occasional stair-climbing; the ability to work only on level surfaces; and the need for work that is unskilled and learnable on short demonstration and which does not require public contact, frequent communication, or reading more than single words or short sentences.

The ALJ discounted Plaintiff's claims concerning the severity and persistence of her symptoms, noting that her allegations were not sufficiently supported by diagnostic evidence (Tr. 77). The ALJ also noted that Plaintiff's younger age, level of education, and work background show that she is able to maintain unskilled, sedentary employment (Tr. 77).

Finally, relying on the VE's testimony, the ALJ found that Plaintiff would be able to perform occupations existing in the Detroit Metropolitan region such as office clerk, approximately 1,800 jobs; and assembler, approximately 250 jobs (Tr. 80).

### III.  STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a

---

[2]20 C.F.R. §§ 404.1567(a); 416.967(a) defines sedentary work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."

scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir.1986) (*en banc*).   In determining whether the evidence is substantial, the   must "take into account whatever in the record fairly detracts from its weight." *Wages v. Sec'y of Health & Human Servs.*, 755 F.2d 495, 497 (6th Cir. 1985).  The must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Sec'y of Health and Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV.  FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. § 416.920(a).  The Plaintiff has

-15-

the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 964 (6th Cir.1984).

## V.  ANALYSIS

Plaintiff makes four arguments in favor of Summary Judgment.  *Plaintiff's Brief* at 7-20. First, she asserts that the ALJ erred by concluding that her medical issues, either alone or in combination, do not meet or equal a listed impairment in Appendix I, Subpart P, of Part 404. Second, she argues that the ALJ erred in assessing her credibility.  Third, she alleges that the ALJ's assessment of her  Residual Functional Capacity is not supported by substantial evidence.  Fourth, she contends that the hypothetical question posed to the VE did not account for her full degree of limitation.

The combination of errors in this case casts sufficient doubt on the reliability of the ALJ's decision that the matter should be remanded for clarification and reconsideration.  Because the credibility determination bears upon Plaintiff's remaining arguments, it will be discussed first.

### A.  Credibility

Plaintiff argues that substantial evidence does not support the ALJ's credibility determination.  She contends that the ALJ erred in assessing the credibility of her testimony concerning the intensity and persistence of her symptoms.  *Plaintiff's Brief* at 15-16.

The credibility determination, guided by SSR 96-7p, describes a two-step process for

-16-

evaluating symptoms. *See Duncan v. Sec'y of Health and Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). "First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment… that can be shown by medically acceptable clinical and laboratory diagnostic techniques." *Id.* Second, SSR 96-7p directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ must analyze the claims "based on a consideration of the entire case record."[3]

Finding medical considerations alone to be inadequate for evaluating Plaintiff's alleged mental disability, the ALJ looked to the record as a whole, and concluded that while her medically determinable impairments could be expected to cause the alleged symptoms, her claims concerning the intensity, persistence, and limiting effects of the symptoms were not credible (Tr. 77-78). The ALJ found that her work as a CNA and a housekeeper in addition to the fact that she owned her own home, lived independently, and had a driver's license

---

[3] C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) lists the factors to be considered in making the determination:

> (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

undermined the likelihood that her impairments would cause the symptoms that she asserts (Tr. 77-79). He acknowledged that while Dr. Bodoin's assessment established the presence of a cognitive disorder and a mood disorder, she nonetheless had failed to pursue therapy or psychotropic medication from her longtime treating physician, Dr. Clearance McRipley, M.D (Tr. 77). Relying on the fact that she has failed to pursue treatment for her alleged mental impairment, the ALJ inferred that "medical considerations alone were inadequate for evaluating disability as the record tends to mitigate against the presence of adaptive deficits preceding age 22" (Tr. 77-78).

While there are certain factors in support of the ALJ's credibility determination, the ALJ nevertheless erroneously discounted Plaintiff's credibility determination because she failed to pursue medical treatment for her cognitive impairment. The relevant Social Security Ruling provides as follows:

> The adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to re-contact the individual or question the individual at the administrative hearing in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner.

SSR 96-7p, 1996 WL 374196, at *7 (July 2, 1996).

The Sixth Circuit has recognized that "ALJ's must be careful not to assume that a patient's failure to receive mental-health treatment evidences a tranquil mental state," because "[f]or some disorders, the very failure to seek treatment is simply another symptom

-18-

of the disorder its self."  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009);
*See also Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989) ("Appellant may have
failed to seek psychiatric treatment for his mental condition, but it is questionable practice
to chastise one with a mental impairment for the exercise of poor judgment in seeking
rehabilitation.").

It is evident from the administrative opinion that the ALJ's decision to discount
Plaintiff's testimony concerning the intensity, persistence, and limiting effects of her mental
limitations was based, at least in part, upon her failure to pursue treatment.  Yet, under SSR
96-7p, the ALJ was obligated to consider whether good existed for Plaintiff's failure to seek
treatment for her cognitive disorder.  During the administrative hearing, however, the ALJ
failed to ask Plaintiff why she has not pursued mental health treatment, and the
administrative opinion does not offer an explanation of the matter.  *See Bowen v. Comm'r
of Soc. Sec.*, 478 F.3d 742, 745 (6th Cir. 2007) ("Even if supported by substantial evidence,
however, a decision of the Commissioner will not be upheld where the SSA fails to follow
its own regulations.").  Additionally, the ALJ failed to consider the possibility that
Plaintiff's failure to seek mental health treatment might be attributable to her underlying
mental condition. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009); *See
also Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989).  This omission is
particularly crucial given the importance of Plaintiff's own testimony and the paucity of
objective evidence supporting the presence of adaptive deficits preceding age 22.
Accordingly, upon remand, the ALJ must 1) inquire as to whether good cause existed for

Plaintiff's failure to seek treatment, and 2) determine whether her failure to pursue therapy might be caused by her underlying mental health condition.

## B. Listed Impairment

Plaintiff contends that the ALJ committed reversible error at Step Three by finding that she did not have an impairment or combination of impairments equaling a listed impairment. *Plaintiff's Brief* at 8. Specifically, she argues that her low IQ score and school records demonstrate that her mental impairment equals Listed Impairment 12.05(B). *Plaintiff's Brief* at 11. She argues alternatively that her physical impairments, coupled with her mental limitations satisfy listed impairment 12.05C. Listing 12.05 provides as follows:

> Mental retardation refers to significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., *the evidence demonstrates or supports onset of the impairment before age 22.*
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing), and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; or
>
> B. A valid verbal, performance, or full scale IQ of 59 or less; or
>
> C. A valid verbal, performance, or full-scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work related limitation of function; or
>
> D. A valid verbal, performance or full-scale IQ of 60 through 70, resulting in at least two of the following:
>
> > 1) Marked restrictions of activities of daily living; or
> >
> > 2) Marked difficulties in maintaining social functioning; or

    3) Marked difficulties in maintaining concentration, persistence, or pace; or

    4) Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.05(B-D) (emphasis added).

    Because the ALJ's credibility determination is deficient, however, the Court is unable to assess whether the ALJ was correct in concluding that Plaintiff failed to satisfy the requirements of listing 12.05. A revised credibility determination may cast a different light on the finding that Plaintiff did not have a mental impairment before age 22, especially when considering the dearth of objective evidence in support of her alleged mental disability. Thus, upon remand, the ALJ should reconsider whether Plaintiff meets listing 12.05 subsequent to his reassessment of the credibility determination as discussed above.

    Nevertheless, Plaintiff takes issue with the ALJ's finding that the record does not adequately indicate the presence of a mental deficit before age 22. *Plaintiff's Brief* at 9-14. Plaintiff cites her poor elementary school records and describes the contents of a "Health Card" which document her sight and hearing limitations as a child. *Plaintiff's Brief* at 10-11. However, because the school records were not presented to the ALJ, they are not properly before the. To the extent that she would argue that the Court may give limited consideration to such material pursuant to Sentence Six of 42 U.S.C. § 405(g), she has provided no good cause for the tardy submission. Nevertheless, upon remand, the ALJ may consider any legible school records presented by Plaintiff.[4]

_____

[4] Although Plaintiff's previous attorney, Philip Fabrizio, submitted her school records to the administrative record at the July 2009 hearing, the documents were deemed

-21-

Finally, Plaintiff asserts that the ALJ erred under his Step Two analysis by failing to consider her migraines, hypertension, and diabetes; additionally, she seems to argue that this omission has bearing on his Step Three findings. *Plaintiff's Brief* at 8. First, Plaintiff did not list the above-mentioned conditions as disabling impairments (Tr. 242). Second, the record contains scant proof that these conditions created a workplace limitation. Because the ALJ properly excluded these additional symptoms, this argument is without merit.

### C. RFC Determination

Plaintiff disputes the ALJ's RFC determination which found that she was capable of performing sedentary work. *Plaintiff's Brief* at 16. She contends that the ALJ's RFC determination was flawed because he gave minimal weight to Dr. McRipley's opinions, and instead assigned greater weight to the Residual Functional Capacity Assessment conducted by Dr. Montasir in July 2009. *Plaintiff's Brief* at 16 *citing* (Tr. 78).

The ALJ reasoned that Dr. McRipley's opinions deserved only minimal weight because they are "conclusory and supported only very loosely" (Tr. 78). Indeed, Dr. McRipley's records merely list diagnoses, and fail to provide supporting clinical results or diagnostic findings. Contrary to Plaintiff's assertion, however, the ALJ was not required to give

---

illegible by the ALJ (Tr. 21-22). Plaintiff's current attorney, Eva Guerra, contends that she has since received "original" copies from Mr. Fabrizio and is willing to submit the documents to the . *Plaintiff's Brief* at 9. Sentence Six of 42 U.S.C. § 405(g) states that the "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."

substantial weight to Dr. McRipley's unsupported conclusions. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 286 (6th Cir. 2009) ("Conclusory statements from physicians are properly discounted by ALJs."). Because the ALJ permissibly adopted the findings of Dr. Monatsir, Plaintiff's argument is without merit. *See Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 175-76 (6th Cir. 2009) ("Where the opinion of a treating physician is not supported by objective evidence or is inconsistent with other medical evidence in the record, this Court generally will uphold an ALJ's decision to discount that opinion.").

Next, Plaintiff asserts that the ALJ's RFC determination precluding her from exposure to "excessive concentrations of dusts, fumes, odors or temperature extremes" constitutes a faulty interpretation of both treating and non-treating records. *Plaintiff's Brief* at 16-18. She cites Dr. McRipley's examination notes indicating that all pulmonary irritants "should be avoided"; she also refers to Dr. Montasir's assessment which provides that she should "never" be exposed to pulmonary irritants. *Plaintiff's Brief* at 17-18. Plaintiff's argument, however, is without merit due to the fact that the ALJ's RFC determination concerning her asthma included a reasonable assessment of the medical proof in the administrative record. The ALJ took note of Dr. Montasir's examination, which indicated that Plaintiff exhibited scattered wheezing but no accessory muscle use or retractions (Tr. 78, 534).   He also reported that Dr. Montasir's examination found that her lungs were clear to auscultation and expanded equally (Tr. 78, 534).  The ALJ noted that Plaintiff was hospitalized only once for asthma exacerbation in April 2007 (Tr. 78).  Additionally, the ALJ found Dr. McRipley's conclusory diagnoses of permanent disability to be inconsistent with Plaintiff's testimony

-23-

that she was capable of performing a sedentary job as long as her asthma did not "bother" her (Tr. 33, 78). Plaintiff glosses over the fact that while consultative physician Dr. Montasir indicated that she should "never" be exposed to certain environmental irritants, he nonetheless went on to conclude that despite her asthma, she is capable of performing a restrictive range of light work (Tr. 78, 536-37). Because the ALJ properly weighed the evidence in the administrative record in arriving at his RFC determination, remand on this issue is not warranted.

### D. Hypothetical Question

Finally, Plaintiff argues that the hypothetical question posed to the VE failed to account for her full degree of limitation. *Plaintiff's Brief* at 18. Specifically, she asserts that the ALJ's hypothetical question was flawed because it mis-characterized her asthmatic condition and improperly discounted her restricted ability to maintain attention and concentration for extended periods. *Plaintiff's Brief* at 18-19. The failure to account for a claimant's work related limitations in the hypothetical question to the VE constitutes error. *See Varley v. Comm'r of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

While Plaintiff's argument regarding the ALJ's hypothetical question is unconvincing, other grounds exist for remand. After having reviewed the testimony and administrative opinion, it is evident that there are discrepancies surrounding the VE's testimony.

-24-

Specifically, it is unclear whether the ALJ adopted Dr. Bodoin's findings, and as will be explained below, because the degree of import given to Dr. Bodoin's assessment bears upon the "significant numbers" requirement, the case should be remanded for clarification. 20 C.F.R. § 404.1566(b) explains the "significant numbers" requirement as follows: "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications."

Specifically, the VE's original job findings indicated that Plaintiff could perform the unskilled, sedentary jobs of office clerk, 1,800 positions in the Detroit area, and assembler/inspector, 250 positions in the Detroit area (Tr. 48-49). The VE testified that these jobs exist in the "thousands" at the national level (Tr. 49). However, during the administrative hearing, the VE testified that if Plaintiff were limited by the cognitive deficits found in Dr. Bodoin's assessment, such as restricted aptitude in reading and math, she would not be capable of maintaining employment as an office clerk, leaving merely 250 jobs in the regional economy (Tr. 55-56).

However, the administrative opinion provides no clear guidance as to the extent that Dr. Bodoin's findings were adopted. In accord with Dr. Bodoin's findings concerning Plaintiff's limited reading ability, the ALJ's RFC determination limits Plaintiff to reading "single words or short sentences" (Tr. 76-77). The ALJ's citation to Dr. Bodoin's report (Tr. 77) would also suggest that the opinion was adopted. Confusingly, however, the ALJ

-25-

concluded under his Step Five analysis that Plaintiff could perform both the assembler/inspector *and* the office clerk positions, citing the VE's vague testimony that the positions existed in the "thousands" nationwide (Tr. 79-80). Because 250 jobs in the regional economy, accompanied only by the statement that "thousands" of jobs exist nationwide would not likely constitute a "substantial number" of jobs, whether Dr. Bodoin's assessment was adopted in its entirety is critical to review of the case.[5]

While the ALJ was not required to perform a "treating physician" type analysis of the consultive findings, the lack of meaningful discussion concerning the import of Dr. Bodoin's findings prevents the Court from determining whether Plaintiff is capable of performing 2,050 jobs or 250 jobs in the regional economy. *See Lowery v. Comm'r, Soc. Sec. Admin.*, No. 01-5970, 2003 WL 236419, at *5 (6th Cir. Jan. 30, 2003) (*citing Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995) ("An ALJ must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning."). Moreover, because the adoption of Dr. Bodoin's findings could also be used to support the

---

[5]Recognizing that it is "impossible to set forth one special number as the boundary between a 'significant number' and an insignificant number of jobs," the Sixth Circuit found in *Born v. Sec'y of Health & Human Servs.*, 923 F.2d 1168, 1174 (6th Cir. 1990), *citing Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988) that 1,350-1,800 jobs in the local economy constitute a significant number. Other Circuits have found that in some circumstances, fewer than even 1,000 jobs in the local economy constitute a significant number. *See Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988) (500 jobs). In *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999), the Sixth Circuit held that 700 jobs regionally was significant in light of the fact that 700,000 existed nationally. Unlike *Harmon*, in the case at bar, the finding that 250 regional jobs exist is not accompanied by a meaningful estimate of national job figures; accordingly, the  is unable to assess the "significant jobs" requirement.

-26-

presence of a mental impairment before age 22, clarification of whether Dr. Bodoin's findings were adopted in full, in part, or rejected altogether, is particularly critical. *See Siuta v. Comm'r of Soc. Sec.*, No. 05-72858 (E.D. Mich. July, 21 2005) (Report and Recommendation granting Plaintiff's Motion for Summary Judgment in part); *See also McPeek v. Sec'y of Health and Human Servs.*, No. 93-5204, 1994 WL 56929, at *2 (6th Cir. Feb. 24, 1994) ("It is generally believed that a person's mental ability or intellect remains rather similar unless one undergoes some brain or neurological trauma or due to the aging process or disease.").

These errors, while significant, do not automatically entitle Plaintiff to benefits. *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). Rather, the appropriate remedy is a remand for further administrative proceedings consistent with this Report and Recommendation.

## VI. CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Doc. #21] be DENIED and  Plaintiff's Motion for Summary Judgment [Doc. #18] GRANTED to the extent that the case be remanded further proceedings.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 (1985); *Howard v. Secretary of HHS,* 932 F.2d

-27-

505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Date:  August 6, 2012

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail disclosed on the Notice of Electronic Filing on August 6, 2012.

s/Johnetta M. Curry-Williams
Case Manager

-28-